IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-09-00273-CV

 

Osvaldo N. Chapa,

                                                                                    Appellant

 v.

 

Brad Livingston,

                                                                                    Appellee

 

 

 



From the 278th District
Court

Walker County, Texas

Trial Court No. 24,673

 



MEMORANDUM  Opinion



 








Osvaldo N. Chapa, a Texas inmate, filed
an in forma pauperis application for writ of mandamus against Brad
Livingston, executive director of the Texas Department of Criminal Justice, for
violations of the Public Information Act.  The Texas Attorney General filed an amicus
curiae advisory requesting dismissal of the suit.  The trial court
dismissed the suit under Chapter 14 of the Civil Practice and Remedies Code.  Chapa
challenges: (1) the dismissal of his lawsuit; (2) TDCJ’s failure to post Chapter
14’s requirements in the prison law library; (3) the trial court’s failures to conduct
a hearing before dismissal and give him an opportunity to amend his pleadings;
(4) violations of his right to access the courts; and (5) the trial court’s
failures to conduct a hearing on his motion for new trial and file findings of
fact and conclusions of law.  We affirm.

                                                                                         DISMISSAL

            In point one, Chapa contends
that the trial court improperly dismissed his lawsuit, with prejudice, under
Chapter 14 of the Civil Practice and Remedies Code.

A trial court may dismiss a suit under
Chapter 14 if it is frivolous, considering whether: (1) the claim’s realistic
chance of ultimate success is slight; (2) the claim has no arguable basis in
law or in fact; (3) it is clear that the party cannot prove facts in support of
the claim; or (4) the claim is substantially similar to a previous claim filed
by the inmate because the claim arises from the same operative facts.  Tex. Civ. Prac. & Rem. Code Ann. §
14.003(a)(2), (b) (Vernon 2002).  When,
as here, the trial court determines without a hearing that a claim is
frivolous, that decision may be affirmed on appeal only if the claim has no
arguable basis in law.  Long v. Tanner, 170 S.W.3d 752, 754 (Tex. App.—Waco
2005, pet. denied) (citing Retzlaff v. Tex. Dep’t of Crim.
Justice., 94
S.W.3d 650, 653 (Tex. App.—Houston [14th Dist.] 2002, pet. denied)). 
We review this issue de novo.  Id.  We take the allegations of the
plaintiff’s petition as true.  Id. (citing Mullins
v. Estelle High Sec. Unit, 111 S.W.3d 268, 272 (Tex.
App.—Texarkana 2003, no pet.)).  We examine the claims asserted and
the relief requested “to determine whether, as a matter of law, the petition
stated a cause of action that would authorize relief.”  Id. (quoting Spurlock
v. Johnson, 94 S.W.3d 655, 658 (Tex. App.—San Antonio 2002, no
pet.)).

            The trial court dismissed
Chapa’s lawsuit for failure to comply with both the procedural and substantive
requirements of Chapter 14.

Chapter 14 requires an inmate to file
(1) an affidavit or unsworn
declaration providing information regarding any previous filings; and (2) an affidavit or unsworn declaration that
states the “date that the grievance was filed and the date the written decision…was
received by the inmate.”  Tex. Civ. Prac. & Rem. Code Ann. § 14.004(a) (Vernon 2002); Tex. Civ. Prac. & Rem. Code Ann. §
14.005(a) (Vernon 2002).  Neither document was filed with Chapa’s original
petition, but Chapa moved to supplement his petition with the required
affidavits.  However, Chapa’s affidavit of previous filings fails to state the
“operative facts for which relief was sought.”  Tex. Civ. Prac. & Rem. Code Ann. § 14.004(a)(2)(A).

Chapter 14 also requires an inmate to file a claim “before the 31st day
after the date the inmate receives the written decision from the grievance
system.”  Tex. Civ. Prac. & Rem. Code
§ 14.005(b).  Chapa received a response to his step 2 grievance on March 20,
2009, but filed suit on May 18, more than thirty-one days later.  See
id.

Dismissal was proper for failure to
comply with the procedural requirements of sections 14.004(a) and 14.005(b).  See Clark v. J.W. Estelle Unit, 23 S.W.3d 420, 422 (Tex. App.—Houston
[1st Dist.] 2000, pet. denied); see also Allen v. Tex. Dep’t of Crim.
Justice-Institutional Div., 80 S.W.3d 681, 683 (Tex. App.—Houston [1st
Dist.] 2002, pet. denied).

Dismissal was also proper for failure to
comply with Chapter 14’s substantive requirements.  Chapa alleged that TDCJ violated
the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the
United States Constitution by ignoring his request for information under the
Public Information Act.

While a governmental body need not comply
with a request for information from an incarcerated individual, it is not
prohibited from disclosing information that pertains to the inmate.  See Tex. Gov’t Code
Ann. § 552.028(a), (b) (Vernon 2004); see also Hickman v. Moya,
976 S.W.2d 360, 361 (Tex. App.—Waco 1998, pet. denied).  Because section 552.028 is not
mandatory, but gives the governmental body discretion to disclose or not
disclose the requested information, Chapa’s claim under the Texas Public
Information Act has no arguable basis in law.  See Hickman, 976 S.W.2d at 361; see also Harrison v. Vance, 34 S.W.3d 660, 663 (Tex. App.—Dallas
2000, no pet.).

Because the trial court properly
dismissed Chapa’s lawsuit for failure to comply with the procedural and
substantive requirements of Chapter 14, we
overrule point one. 

POSTING REQUIREMENTS

            In point two, Chapa contends
that the TDCJ failed to post the requirements of Chapter 14 in the prison law
library.

            The 1995 session law
enacting Chapter 14 required TDCJ to “post notice of the provisions of this Act in each law library maintained by the
department or under contract with the department.”  See Act of May 19,
1995, 74th Leg., R.S., ch. 378, § 9, 1995 Tex. Gen. Laws 2921, 2926-27.  “[T]he
fundamental constitutional right of access to the courts requires prison
authorities to assist inmates in the preparation and filing of meaningful legal
papers by providing prisoners with adequate law libraries…”  Bounds v. Smith, 430 U.S. 817, 828, 97 S. Ct. 1491,
1498, 52 L. Ed. 2d 72 (1977) (emphasis added).  “‘[M]eaningful access to the courts is the
touchstone’…and the inmate therefore must go one step further and demonstrate
that the alleged shortcomings in the library or legal assistance program
hindered his efforts to pursue a legal claim.”  Lewis v. Casey, 518 U.S. 343, 351, 116 S. Ct. 2174,
2180, 135 L. Ed. 2d 606 (1996) (quoting Bounds, 430 U.S. at 823, 97 S.
Ct. at 1495).

            Even had Chapa complied with
Chapter 14’s procedural requirements, his asserted claim has no arguable basis
in law.  Accordingly, Chapa cannot show that TDCJ’s failure to post notice of
Chapter 14’s requirements rendered the prison law library so subpar as to
hinder his efforts to pursue a legal claim.  See Lewis, 518 U.S. at 351, 116 S. Ct. at 2180.  We overrule point two.

ABSENCE OF HEARING BEFORE DISMISSAL

FAILURE TO ALLOW OPPORTUNITY TO AMEND

 

            In point three, Chapa contends
that the trial court violated his rights to due process, equal protection, and
access to courts by failing to hold a hearing before dismissing his lawsuit and
failing to allow him an opportunity to amend.

          Because the decision to hold a hearing
on the dismissal of inmate litigation is within the trial court’s discretion, the
trial court did not err by dismissing Chapa’s lawsuit without a hearing.  See
Moreland v. Johnson, 95 S.W.3d 392, 394 (Tex.
App.—Houston [1st Dist.] 2002, no pet.); see also Tex.
Civ. Prac. & Rem. Code Ann. § 14.003(c); Long, 170 S.W.3d at 754.  Moreover, Chapa’s claim has no arguable basis in
law; thus, dismissal with prejudice was appropriate.  See Nabelek v. Dist. Attorney of Harris
County, 290 S.W.3d 222,
233 (Tex. App.—Houston [14th Dist.] 2005, pet. denied); see also Williams v.
Ballard, No.
10-08-00378-CV, 2009 Tex.
App. LEXIS 9246, at *4 (Tex. App.—Waco Dec. 2, 2009, no pet.) (mem.
op.).  We overrule point three.

ACCESS TO COURTS 

            In
point four, Chapa contends that the trial court violated his right to open
courts by dismissing his lawsuit.  However, Chapter 14 does not violate the
constitutional right to access the courts.  See Sanders v. Palunsky, 36 S.W.3d 222, 226-27 (Tex.
App.—Houston [14th Dist.] 2001, no pet.); see also Hughes v. Massey, 65
S.W.3d 743, 745 (Tex. Sapp.—Beaumont 2001, no pet.); Guynes v. Texas Bd. of
Pardons & Paroles, No.
03-99-00767-CV, 2000 Tex.
App. LEXIS 3193, at *13 (Tex. App.—Austin May 18, 2000, no pet.) (not
designated for publication).  We overrule point four.

ABSENCE OF HEARING ON MOTION FOR NEW
TRIAL

FAILURE TO FILE FINDINGS OF FACT AND
CONCLUSIONS OF LAW

 

            In point five, Chapa
challenges the trial court’s failure to hold a hearing on his motion for new
trial and denial of his motion for findings of fact and conclusions of law.

            Because Chapa’s lawsuit was dismissed
without a jury, the trial court did not err by denying Chapa’s motion for new
trial without a hearing.  See Hamilton v. Williams, 298 S.W.3d
334, 338 (Tex. App.—Fort Worth 2009, pet. filed); see also Jefa Co. v.
Mustang Tractor & Equip. Co., 868 S.W.2d 905, 909 (Tex. App.—Houston
[14th Dist.] 1994, writ denied).  Nor was the trial court required to file
findings of fact and conclusions of law when
dismissing Chapa’s lawsuit under Chapter 14.  See Retzlaff, 94 S.W.3d at 655.  We overrule point five.




            We affirm the trial court’s
judgment.

 

FELIPE REYNA

Justice

Before Chief
Justice Gray,

Justice
Reyna, and

Justice
Davis

(Chief
Justice Gray concurring with note)*

Affirmed 

Opinion
delivered and filed August 25, 2010 

[CV06]

 

*           (Chief
Justice Gray concurs in the Court’s judgment.  A separate opinion will not
issue.)






 name="_ftnref3" title="">[3]  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each Holley factor will not support such a
finding.  Id.

         The Holley factors focus on the
best interest of the child, not the best interest of the parent.  Dupree v. Tex. Dept. Prot. & Reg. Servs., 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ) (citing
D.O. v. Tex. Dep’t of Human Servs., 851 S.W.2d 351, 358 (Tex.
App.—Austin 1993, no writ)).  But there is a strong presumption that the best
interest of the child will be served by preserving the parent-child
relationship.  Swate, 72 S.W.3d at 767.  “The presumptive right of parents is grounded in good policy
considerations.”  Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex. 1976).  It is the public policy of Texas to “assure that children will have frequent
and continuing contact with parents who have shown the ability to act in the
best interest of the child.”  Tex. Fam.
Code Ann. § 153.001(a)(1) (Vernon 2002).  On the other hand, the goal of establishing a stable permanent home
for a child is a compelling state interest.  Dupree, 907 S.W.2d at 87.

          Barbara’s mother Lillian testified,
stating that Barbara had made a “total turn around” and that after Barbara finished
her treatment program at the Oxford House, Barbara and the children could stay
in their Connecticut home and Lillian and Barbara’s father would financially
support Barbara and the children, including paying for a nanny, if necessary. 
Barbara’s brother, who now runs the family kennel, has offered Barbara a job
there.  Lillian said that if Barbara were to relapse in her drug addiction, she
and her husband would take care of the children financially.

          Barbara explained to the trial court
why it would not be in the children’s best interest for her rights to be
terminated:

Because I have changed my life.  I have – I have
never worked a program before.  Although I have been in treatment, I have never
worked a program before and this time I have.  I have a sponsor who I meet with
weekly.  I am – this was a totally different kind of treatment.  It was very
intense, very get rid of all the crap that make people use drugs.  I mean, a
lot of stuff is emotional and from your background and what happened when you were
a child.  And this place made me go through all of that and deal with all of
that. . . .  I’m just not feeling that I’m the same person anymore.  I have
changed a lot.  I love my kids and I want to be with them.

 

She later testified:

 

I have always taken care of these girls.  I have
been there for them.  I have had the means to take care of them to the best of
my ability to take care of them and raise them.  They are everything to me. 
They are all I want in life is to take care of my girls and raise my girls.  I
don’t want them to never know who I am or just to have memories of me.  My
girls are everything to me.

 

And I know that I have done wrong.  I know that
I have screwed up in the past.  But I also know that I am capable of doing
this; that I have gone through such a change that it’s amazing the things I can
do in my life now.  And I know I can do them.  And I don’t – I don’t get upset
if somebody says, “There’s no way you can do that,” because I prove them wrong,
that I can.

 

I’m very good at what I do in my grooming.  And
I’m very good at taking a dead job that had nothing – that had no – and raised
it.  And I’m now making $300 a week.  And I did this in a month and a half or
less time.  I know I can provide for my children.  I know I can take care of
them.  And I know I can give them a good place and a good and safe home to live
in. . . .  I want my kids.

 

          Barbara admitted that her past drug
use had not been in the children’s interest, but she said she always made sure
that they were taken care of, housed, clean, clothed, and had what they
needed.  Barbara did not have an opinion on whether termination of Charles’s
parental rights would be in the children’s best interest, but she did not want
any type of relationship with him.  She did not want Charles to have possession
of the children, and if the court ordered that Charles have no contact with the
children, Barbara would comply.

Christina Corwin, a
counselor assigned to Barbara by CPS, provided her with therapy from September
2003 until January 2004, dealing with drug issues, coping skills, and
depression.  Her main concern during therapy was Barbara’s relapses, and she
recommended residential treatment, which Barbara sought and completed.  Corwin
noted that Barbara really cared for her children, strove to be a good parent,
asked for help and advice, and took responsibility for her mistakes.  Corwin
had no criticism of Barbara during the time that she treated her; she thought
Barbara was a good person.  Corwin felt that, with additional time (six months)
and supervision, Barbara could meet the requirements to have the children
returned, noting that the children had never been injured and that Barbara’s
issues were drugs and bad choices in men.  She recommended reunification under
the right circumstances.  Because she had not seen Barbara in over a year,
Corwin would not opine on termination.

Wesley Walker, the
children’s counselor through CPS, provided them therapy for thirty-three
weeks.  He attributed their behavioral difficulties to their removal and their
foster care experiences.  He said that much of A.H.W.’s acting out was the
result of being separated from Barbara.  Walker described the children as very
bonded to Barbara; she was the central focus of their attention and play, they
always talked positively about her, and they felt they would be reunited.  The
girls were always very positive after their visits with Barbara, and they never
talked negatively or acted out.  They did not react well to talk of
termination; rather, they showed significant anxiety.  Walker thought that it
could be extremely detrimental for the children if Barbara were removed from
their lives; he also said it would be just as detrimental if Barbara’s rights
were not terminated and she went back to using drugs.  He knew of no clear and
convincing evidence that Barbara’s rights should be terminated, and he thought
that, if Barbara got the children back, stayed clean for six more months, and
got the children more counseling, it would have a good effect on the children.

Mark Van Dusen was
Barbara’s counselor at the Central Texas Treatment Center, a long-term
treatment center, and treated her from June 2004 to December 2004.  Barbara’s
treatment method was based on “cognitive restructuring,” where the patient
learns to change the way she thinks in order not to have the behaviors that get
her in trouble.  He said that after a slow start, Barbara grasped
recovery—particularly the 12-step program—and made a dramatic change.  She
became very attentive and was “dead set” on getting her children back.  He
observed her visits with the children, noticing that they were loving, happy,
and responsive with Barbara and were fairly well adjusted.  Van Dusen thought that
Barbara should have a chance to have the children in a structured environment
like Oxford House and that her rights should not be terminated.  If Barbara
returned to using cocaine, Van Dusen thought that the children should not be
with her.

Katherine Davis, a
probation officer and licensed chemical dependency counselor at the Central Texas Treatment Center, treated Barbara there in a program that emphasized
mother/daughter issues, relationships, chaos and conflict avoidance, and
self-esteem.  In this program Barbara was able to rebuild her relationship with
her mother.  After her discharge in December 2004, Barbara was to be in Davis’s women’s skills group for a year.  Davis confirmed the adequacy of Oxford House,
which she said had a high success rate.  She said that Barbara and the children
could stay there as long as Barbara wanted, though Davis recommended against
immediate placement of the children with Barbara because planning for such a
change would be needed.  She envisioned Barbara’s long-term recovery plan to
take three to five years.  Davis told the court, “Professionally, I think that
Barbara has what it takes, with some services, with a plan that she can do
this.”

Debbie Miller, the
director of Waco Child Care, a daycare facility where Barbara had the children
at one point (when Barbara was struggling financially and using), saw nothing
that concerned her about the girls’ condition.  Barbara appeared to Miller to
put the children’s needs first.  Based on her past interaction with and
observations of Barbara and the children, Miller did not believe that Barbara’s
rights should be terminated.  Jill McCall was executive director of Compassion
Ministries and testified that Barbara’s history of hard work and honest
self-disclosure and her loving and close relationship with her daughters
warranted giving Barbara a second chance.  James Lawson, a counselor at the Freeman Center, where he became acquainted with Barbara and the children, said that Barbara
should be given another chance, based on her recovery and progress to date on
her depression and codependent behavior problems.  Ella Pearl Foster, the
foster parent who cared for the children in the year before trial, said that
they were always happy talking about Barbara, had good memories of her, and
loved her.  A.H.W. wanted to stay with Barbara and was angry when she could
not.

Katy Capp Hays, a CPS
supervisor, opined that Barbara’s parental rights should be terminated because
of her long history of drug abuse and relapse, her history of involvement with
abusive men, and the need for the children to have a safe and permanent home. 
Hays did not think that a drug rehab home like Oxford House was appropriate for
the children, but she had never visited it.  Also, Hays and the Department did not
have any of Barbara’s treatment records for the year before trial, and she had
not communicated with Barbara’s providers for the prior year.  Hays believed
that Barbara’s prognosis for avoiding a relapse was poor, but she conceded that
Barbara’s drug counselors were in a better position to judge Barbara’s success
potential.

Jamie Grohoske, who was
the children’s current CPS caseworker, said that termination was appropriate
because of her past reluctance to leave Charles when he sold drugs out of their
home and was violent in the children’s presence, and because Barbara’s
continued need for restrictive supervision was not healthy for the children.  She
felt that Barbara would continue to put the children at risk and was concerned
of a relapse in the future.  Grohoske thought that, after three years in
institutional or foster care, the children need stability.  According to
Grohoske, Barbara had done what was on her service plan, but she had not proved
to Grohoske that she could provide a safe and stable home for the children. 
Grohoske also said that Barbara had not paid court-ordered child support, but
Grohoske admitted not setting up the account for Barbara and that there was a
good chance Barbara did not even know about it.

  Grohoske described
Barbara’s relationship with the children as more like peers than parent-child
and that the children did not see Barbara as an authority figure.  Grohoske
admitted that she had little information on Barbara for the six-month period
before trial, but she nevertheless recommended termination.  She also admitted
that if it were not for the Family Code’s dismissal deadline in this case, she
would be staffing with her supervisor for possible reunification.

         We will evaluate the legal and factual sufficiency
of the evidence primarily in the context of the Holley factors, but also
with consideration of the Family Code’s best interest factors found in section
263.307.  See In re J.I.T.P., 99 S.W.3d 841, 846-48 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (applying Holley factors and section 263.307 factors
in best interest analysis); see also Lana S. Shadwick, Duke Hooten,
& Charles G. Childress, Grounds for Termination of Parental Rights, in
2005-4 State Bar Section Report: Family
Law 9, 10 (Fall 2005) (noting additional factors for determining best
interest in section 263.307 when Department is a party).

 

 

(1)  
     Desires of the
children  

 

          There was no evidence that the
children did not want to reunite with Barbara; in fact, the evidence was
overwhelmingly to the contrary.  CPS acknowledged the strong bonds between
Barbara and the children and their love for her.  See Yonko, --- S.W.3d at ---, 2005 WL 3500775, at *7 (“While [it] is true that the child’s desire to remain with his
parents is only one factor to consider among many, his love for his parents
cannot be ignored as a reflection of the parent’s ability to provide for the
child’s emotional needs.  Where the evidence of the parent’s other failures is
not overwhelming, the desires of the child weigh against termination of
parental rights.”).  The evidence on this factor strongly weighs against a
finding that termination was in the children’s best interest.

          (2)      Emotional and physical
needs of the children now and in the future

          Barbara believed that the children
needed to continue counseling with Walker or another counselor.  Walker, the
children’s counselor, said that termination could be “extremely detrimental” to
the girls, whose behavior he said improved after visits with Barbara.  CPS
agreed that Barbara had met A.H.W.’s medical needs in the past for her seizure
disorder, and Barbara tried to assist CPS and the girls’ foster parents in how
to care for them.  CPS found the girls to be healthy and in good condition when
they were removed.  Despite her drug addiction, the evidence indicated that
Barbara always provided the children with food, clothing, shelter, medical
care, and love while they were in her care.  Barbara admitted that she could go
to prison if her parole was revoked.  Nevertheless, the evidence on this
factor weighs against a finding that termination was in the children’s best
interest.




          (3)      Emotional and physical
danger to the children now and in the future

          There was evidence of one remote violent
act by Charles against Barbara in the children’s presence, and that was when
the children were very young.  But because Charles’s parental rights were also
terminated, he is effectively out of the children’s lives.[4] 
Barbara and her counselors discussed Barbara’s realization in her recovery
program that she did not have to have a man in her life, which indicates that
she was breaking through her cycle of abusive men.  There was no evidence that
the children have been emotionally scarred by any event, and there was no
evidence that Barbara had ever used drugs in the children’s presence in the
past.  There was no evidence that the children were ever physically abused or
that Barbara ever neglected their physical and medical needs.

          CPS caseworkers were primarily
concerned with the risk that Barbara could relapse in the future, despite her
two lengthy periods of sobriety and the progress she had made in the year
before trial.  We acknowledge—as Barbara has—the evidence of her lengthy
scourge of drug addiction.  But we also acknowledge the undisputed evidence
about Barbara’s success in her drug rehabilitation program in the year before
trial and her counselors’ supportive testimony.  See, e.g., Horvatich, 78
S.W.3d at 598-99 (in reversing termination on best interest, court discussed
mother’s rehab success).  Notably, CPS had not even obtained Barbara’s
treatment records for the prior year.

          Certainly there is the theoretical
possibility that Barbara, like any alcoholic or drug addict, could relapse, but
there was no showing by direct evidence of a present or future danger; rather,
it was the speculative opinions of the CPS caseworkers—who had not even
obtained and reviewed Barbara’s recovery records for the prior year—that this “could”
happen in the future and that therefore Barbara’s rights should be terminated. 
However, “acts done in the distant past, without showing a present or future
danger to a child, cannot be sufficient to terminate parental rights.”  Wetzel
v. Wetzel, 715 S.W.2d 387, 391 (Tex. App.—Dallas 1986, no writ) (evidence didn’t support termination of mother's rights based on
finding mother engaged in conduct that endangered physical or emotional
well-being of children because evidence showed mother had been cured of mental
problems that caused her to abuse children).

          We conclude that a reasonable
factfinder could not have credited the disputed evidence in favor of finding
that emotional or physical danger to the children now and in the future would
result from allowing Barbara to retain her parental rights.  The evidence on this factor weighs against a finding that
termination was in the children’s best interest.

          (4)      Parental abilities of the individuals
seeking custody:  

          Grohoske testified that Barbara’s
relationship with the children was more peer-like than parent-child and that
she was not an authority figure to the children, while other witnesses
testified that Barbara and the children were very loving and bonded with each
other and that Barbara appeared to be a good parent.  We conclude that this
factor does not weigh strongly in favor of or against termination of Barbara’s
parental rights.

          (5)      Programs available to
assist these individuals to promote the best interests of the children 

 

          Barbara had complied with or performed
all of the counseling, parenting classes, evaluations, and other tasks required
by the Department.  There was no evidence that she would not avail herself of
additional programs in the future, and on her own she had looked into available
programs and therapy for the children at and near Oxford House, which offers
Alanon and Alatot programs for children.  She had checked into the schools in
the Cedar Park area and after-school programs at the YMCA.   Barbara’s parents
offered financial assistance if needed.

          Other than counseling, the Department
offered no evidence of other programs for the children, including assistance
for treating the girls’ trauma and anxiety upon termination of Barbara’s
parental rights.  The evidence on this factor weighs against a
finding that termination was in the children’s best interest.

          (6)      Plans for the children by
these individuals or by the agency seeking custody  

          Barbara’s short-term plan was for the
children to live with her at Oxford House while she finished her program.  She
has reconciled with her family in Connecticut; her parents would let her and
the children live in their home, and her brother had offered her a job at the
family’s kennel, which is on the same property as the family home.

          The Department’s plan was to place the
children for adoption, but its witnesses admitted that children as old as
A.M.W. and A.H.W. are statistically harder to have adopted.  They also admitted
that because the children are bi-racial (Barbara is white and Charles is
black), that too will make it harder for them to be adopted.  The Department
had no one waiting in the wings to adopt them.  The evidence on this
factor weighs against a finding that termination was in the children’s best
interest.

          (7)      Stability of the home or
proposed placement

          Barbara had obtained permission for
the children to move in with her at Oxford House, which is a residential house
in a residential neighborhood, and they could stay there as long as they
wanted.  The caseworkers were critical of having the children in a residence
with other recovering addicts, but they had not complained when Barbara lived
with the children at the Freeman Center and Compassion Ministries.  If she went
to Connecticut with the children, they would live in Barbara’s childhood home
where Barbara would work with her brother at the family kennel located on the
same property.  Her parents would be living there half of the year (they spend
the winter in Florida), and they would pay for a nanny if necessary.

          At the time of trial, the Department
still had the children in foster care, and it had no prospective adoptive
family.  The evidence on this factor weighs against a finding
that termination was in the children’s best interest.

(8)  
Acts or omissions of
the parent which may indicate that the existing parent-child relationship is
not a proper one 

 

          Barbara’s past drug use and addiction
and her history of abusive relationships are detailed above, as is her recovery
from those problems.  We conclude that because of the passage of time, this
factor does not weigh strongly in favor of or against termination.

          (9)      Any excuse for the acts or
omissions of the parent 

          Barbara took full responsibility for
her drug usage and criminal conduct; she did not offer excuses for her past
behavior, though she pointed to financial stress and trouble with Alton as triggers for her relapse after Compassion Ministries.  We conclude that this
factor does not weigh strongly against or in favor of termination.

          Section 263.307 factors

          Of these thirteen factors, evidence on
only two factors weighs in favor of termination:  subsection (7) history of
abusive or assaultive conduct by child’s family or others who have access to child’s
home; and subsection (8) history of substance abuse.  Tex. Fam. Code Ann. § 263.307(b)(7), (8).  But the compelling
evidence of Barbara’s recovery and its mitigating effect on these factors lead
us to conclude that these two factors do not weigh strongly in favor of
termination.  The evidence on the other eleven factors in section 263.307 weigh
termination.  See id. § 263.307(b)(1-6), (9-13).

          Application

          Hays and Grohoske of CPS both
testified that termination would be in the children’s best interest because of
Barbara’s history of drug addiction and abusive relationships.  On the trial
court’s findings that termination of Barbara’s parent-child relationships with
her two children would be in their best interest, and considering this evidence
in relation to the best interest factors in the light most favorable to the
trial court’s findings, we hold that a reasonable trier of fact could have
formed a firm belief or conviction that termination was in the children’s best
interests.  Yonko, ---
S.W.3d at ---, 2005 WL 3500775, at *11 (finding evidence legally (but not
factually) sufficient on best interest); Horvatich, 78
S.W.3d at 601-04 (same); In re K.C.M., 4 S.W.3d 392, 398-99 (Tex.
App.—Houston [1st Dist.] 1999, pet.
denied) (same), overruled in part on other grounds, In re C.H., 89
S.W.3d 17 (Tex. 2002).  We overrule
Barbara’s no-evidence complaint in her fourth issue.  

          But given the presumption that
children should remain with their parents and the high evidentiary standard the
Department must meet, and viewing all the evidence in a neutral light in
relation to the best interest factors, we hold that a reasonable trier of fact could
not have found factually sufficient evidence exists to form a firm belief or
conviction that termination of Barbara’s parent-child relationships with A.M.W.
and A.H.W. was in their best interest.[5]  See,
e.g., Yonko, --- S.W.3d at ---,
2005 WL 3500775, at *5-11 (reversing termination because of factually
insufficient evidence on best interest); S.A.P., 169 S.W.3d at 706-11
(same); In re C.T.E., 95 S.W.3d 462, 467-69 (Tex. App.—Houston [1st
Dist.] 2002, pet. denied) (same);
Horvatich, 78 S.W.3d at 600-04
(same); In re D.T., 34 S.W.3d 625, 641-42 (Tex. App.—Fort Worth 2000,
pet. denied); K.C.M., 4 S.W.3d at 398-99 (same).  The
evidence is factually insufficient on the best interest findings against Barbara. 
We sustain Barbara’s factual sufficiency complaint in her fourth issue.

            Conclusion

We reverse the trial court’s termination order
and remand this cause to the trial court for a new trial.  We set a new
dismissal date at 180 days after the issuance of our mandate in this cause.  See
In re J.B., 93 S.W.3d 609, 626 (Tex. App.—Waco 2002, pet. denied).  The
trial court may not extend this deadline.  “If the [trial] court ... does not
render a final order or dismiss the suit on or before the required date for
dismissal . . . , the court shall dismiss the suit.”  Tex. Fam. Code Ann. § 263.401(c) (Vernon Supp. 2005).

 

 

BILL VANCE

Justice

 

Before
Chief Justice Gray,

Justice Vance, and

Justice Reyna

          (Chief
Justice Gray dissenting)

Reversed
and remanded

Opinion
delivered and filed February 22, 2006

[CV06]









    [1]       The
trial court terminated Charles’s parental rights with two findings of statutory
violations under subsections 161.001(1)(D)
and (E).





   
[2]       On
Barbara’s second issue, we find that the evidence is legally sufficient to
support the trial court’s finding that she engaged in conduct or knowingly
placed the children with persons who engaged in conduct that endangered the
physical or emotional well-being of the children.  See Tex. Fam. Code Ann. § 161.001(1)(E). 
The following is evidence on which a reasonable trier of fact could have formed
a firm belief or conviction that Barbara engaged in conduct or knowingly placed
the children with persons who engaged in conduct that endangered the physical
or emotional well-being of the children:  Barbara’s cocaine use during her
pregnancy with A.H.W., she remained with Charles despite his pattern of abuse,
and she used cocaine before and after CPS became involved.  Because of this
legal sufficiency holding, the most relief that Barbara can obtain is a remand
for a new trial.  We thus need not address her other two legal sufficiency
complaints.

 





    [3]       In
the context of permanency hearings, the Family Code identifies the following
factors to consider in a best interest determination:

 

(a) In considering the factors established by
this section, the prompt and permanent placement of the child in a safe
environment is presumed to be in the child’s best interest.

(b) The following factors should be considered
by the court, the department, and other authorized agencies in determining
whether the child’s parents are willing and able to provide the child with a
safe environment:

            (1) the child’s age and physical and
mental vulnerabilities;

            (2) the frequency and nature of
out-of-home placements;

            (3) the magnitude, frequency, and
circumstances of the harm to the child;

            (4) whether the child has been the
victim of repeated harm after the initial report and

intervention by the department or other agency;

            (5) whether the child is fearful of
living in or returning to the child’s home;

            (6) the results of psychiatric,
psychological, or developmental evaluations of the child,

the child’s parents, other family members, or
others who have access to the child’s

home;

            (7) whether there is a history of
abusive or assaultive conduct by the child’s family or

others who have access to the child’s home;

            (8) whether there is a history of
substance abuse by the child’s family or others who

have access to the child’s home;

            (9) whether the perpetrator of the
harm to the child is identified;

            (10) the willingness and ability of
the child’s family to seek out, accept, and complete

counseling services and to cooperate with and
facilitate an appropriate agency’s close

supervision;

            (11) the willingness and ability of
the child’s family to effect positive environmental

and personal changes within a reasonable period
of time;

            (12) whether the child’s family
demonstrates adequate parenting skills, including

providing the child and other children under the
family’s care with:

                        (A) minimally adequate
health and nutritional care;

                        (B) care, nurturance,
and appropriate discipline consistent with the child’s

physical and psychological
development;

                        (C) guidance and
supervision consistent with the child’s safety;

                        (D) a safe physical home
environment;

                        (E) protection from
repeated exposure to violence even though the violence

may not be directed at the child;
and

                        (F) an understanding of
the child’s needs and capabilities; and

            (13) whether an adequate social
support system consisting of an extended family and

friends is available to the child.

 

Tex. Fam. Code Ann. § 263.307(a, b) (Vernon 2002).

            





    [4]       We
note ironically that, despite Barbara’s written request to the contrary, CPS
sent legal papers to Charles that revealed Barbara’s physical address.  Barbara
subsequently received a note from Charles that stated that he knew where she
was but would leave her alone.





    [5]       We
question whether the evidence would even meet the lesser standard of
preponderance of the evidence, much less the clear and convincing standard, in
favor of a finding that termination was in the children’s best interest.  See
Horvatich, 78 S.W.3d at 601 (stating evidence didn’t even meet
preponderance standard on best interest and reversing for factual insufficiency
under clear and convincing standard).